## IN THE UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF LOUISIANA

**EDWARD C. ABELL; ELAINE ABELL; IPOP, LLC and RIVERS OF GOLD, GLOBAL TV SHOW, GLOBAL MERCHANDISING LP;**

        **Plaintiffs,**

        **v.**

**U.S. CORPS OF ENGINEERS*;* CHRISTINE WORMUTH, in her official capacity as United States Secretary of the Army; and SCOTT A. SPELLMON, in his official capacity as Chief of Engineers and Commanding General of the U.S. Corps of Engineers;**

        **Defendants**

**CIVIL ACTION**

**CASE NO: 22-CV-1353**

**SECTION:**

**MAGISTRATE NO.:**

### COMPLAINT TO COMPEL AGENCY ACTION PURSUANT TO 5 U.S.C. § 706

    1.    Plaintiffs, the owners of gold claims they seek to mine under circumstances that require the U.S. Army Corps of Engineers to grant a permit under section 404 of the Clean Water Act, are filing this Complaint to Compel Agency Action Pursuant to 5 U.S.C. § 706 to compel the Corps to make a decision on their application for a permit which has been pending since March 16, 2018.  The plaintiffs have provided the Corps with all of the information that it has requested and, despite repeated demands, the Corps has refused to make a permit determination despite statutes and regulations that mandate that such action be taken timely.

**Parties and Venue**

2.      This action concerns the refusal of the U.S. Army Corps of Engineers ("Corps") to issue a permit for gold mining in Alaska, in which Plaintiffs have an interest.

3.      Plaintiff Edward C. Abell has an individual interest, is a member of Rivers of Gold, Global TV Show, Global Merchandising LP, and a resident of Lafayette, Louisiana.

4.      Plaintiff Elaine Abell has an individual interest, is a member of Rivers of Gold, Global TV Show, Global Merchandising LP, and a resident of Lafayette, Louisiana.

5.      Plaintiff IPOP, LLP ("IPOP") is a Nevada limited liability partnership which has applied for the Corps permit.

6.      Plaintiff Rivers of Gold, Alaska Mining, Global TV Show, Global Merchandising LP ("Rivers of Gold") is a California limited partnership that includes partners that reside in Lafayette, Louisiana.

7.      The individual plaintiffs and Rivers of Gold have all entered into an Operating Agreement with IPOP pursuant to which they have engaged IPOP as the operator of certain proposed Alaskan gold operations, with the right to share directly in gold recovered and the obligations to pay costs associated with the mining operation.

8.      Plaintiffs are all real parties in interest and have suffered continuing financial injury by reason of the Corps' failure to make a decision on their permit application, which has been before the Corps since March 16, 2018 as alleged herein.

9.      Defendant Christine Wormuth is the United States Secretary of the Army, sued in her official capacity.  Pursuant to § 404 of the Clean Water Act, 33 U.S.C. § 1344, she is granted authority, "acting through the Chief of Engineers," to grant or deny permits for the "discharge of dredged or fill material into the navigable waters at specified disposal sites".  Defendant Wormuth performs official duties at the Pentagon in Washington, D.C.[1]

10.     Defendant Lieutenant General Scott A. Spellmon is the Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers, sued in his official capacity.  Lt. General Spellmon performs official duties at the headquarters of the Corps in Washington, D.C.[2]

11.     All of the conduct complained of herein represents the actions of subordinate officials of the U.S. Army Corps of Engineers pursuant to authority delegated from defendants Wormuth and Spellmon.

12.     Upon information and belief, and for purposes of this action only, IPOP alleges that all those subordinates are acting within the scope of their authority, albeit not in compliance with federal law, such that defendants are legally accountable for their actions.

13.     Venue in the Western District of Louisiana is appropriate pursuant to 28 U.S.C. § 1391(e)(1)(C) in that, one or more plaintiffs reside within the District.

**Overview**

14.     IPOP has made a gold discovery in the Seward Peninsula in the Bonzai channel — potentially worth billions of dollars.

---

[1] 101 Army Pentagon, Washington, DC  20310-0101.

15.     IPOP has spent over $15 million to construct a floating suction dredge utilizing a 33" cutter head and 10" suction line, coupled with a processing barge that uses the force of gravity to separate gold from dredged bottom sediments, both specially designed for conditions in the Bonanza Channel.  IPOP has shipped this and other equipment to Nome, Alaska, some 25 miles west of the mining claims.

16.     IPOP filed its first permit application on March 16, 2018, under an Application for Permits to Mine in Alaska (APMA) process pursuant to which the State of Alaska accepts applications and distributes them to the State and Federal agencies involved in the permitting process, thus expediting the paperwork for the benefit of the applicant.  The Alaska Department of Natural Resources promptly delivered the application to the Corps and other agencies.

17.     This set off a multi-year process in which the Corps has caused outrageous delays, escalating demands for information, treated IPOP's project in a manner that stands in striking contrast to its treatment of other similarly situated projects, and, by all appearances, has attempted deliberately to obstruct the project, contrary to the public interest and in favor of the private interests of certain project opponents who exercise undue influence on Corps decision making.

**Background Legal Context**

18.     The Corps is an "agency" within the meaning of the Administrative Procedure Act and is subject to the requirements of that Act.

19.     The Corps' failure to act as alleged herein is a species of "agency action" for purposes of judicial review.  5 U.S.C. § 551(13).

---

[2] 441 G. Street, NW, Washington, D.C. 20314-1000.

20.     5 U.S.C. § 555(b) establishes a general statutory requirement that "[w]ith due regard for the convenience and necessity of the parties or their representatives and *within a reasonable time, each agency shall proceed to conclude a matter presented to it.*" (Emphasis added).

21.     The Code of Federal Regulations also contain numerous provisions requiring speed in Corps decision making.

22.     33 C.F.R. § 325.4(a)(1) states that

"When an application for a permit is received the district engineer shall *immediately* assign it a number for identification, acknowledge receipt thereof, and advise the applicant of the number assigned to it. He shall review the application for completeness, and *if the application is incomplete, request from the applicant within 15 days of receipt of the application any additional information* necessary for further processing." (Emphasis added.)

23.     As set forth below, the Corps has repeatedly violated this federal regulation, waiting weeks, months, or even years before requesting additional information, often on the same subjects, over and over.

24.     33 C.F.R. § 325.4(a)(2) states that:

"Within 15 days of receipt of an application the district engineer will either determine that the application is complete (see 33 CFR 325.1(d)(9) and issue a public notice as described in § 325.3 of this part, unless specifically exempted by other provisions of this regulation or that it is incomplete and notify the applicant of the information necessary for a complete application." *See also* 33 U.S.C. § 324.4(d)(1) (reiterating requirement).

25.     There are no applicable exemptions to this requirement, and, as set forth below, the Corps has repeatedly violated this federal regulation, waiting weeks and months before issuing public notices.

26.     33 C.F.R. § 325.4(a)(3) contains a general injunction against delay, stating: "The district engineer should not delay processing of the application unless the applicant requests a reasonable delay, normally not to exceed 30 days, to provide additional information or comments."

27.     C.F.R. § 325.4(d)(3) declares:

*"District engineers will decide on all applications not later than 60 days after receipt of a complete application*, unless

"(i)     precluded as a matter of law or procedures required by law (see below),

"(ii)    The case must be referred to higher authority (*see* § 325.8 of this part),

"(iii)   The comment period is extended,

"(iv)    A timely submittal of information or comments is not received from the applicant,

"(v)     The processing is suspended at the request of the applicant, or

"(vi)    Information needed by the district engineer for a decision on the application cannot reasonably be obtained within the 60-day period. Once the cause for preventing the decision from being made within the normal 60-day period has been satisfied or eliminated, the 60-day clock will start running again from where it was suspended. For example, if the comment period is extended by 30 days, the district engineer will, absent other restraints, decide on the application within 90 days of receipt of a complete application.

(Emphasis added).

28.     As set forth below, the Corps has arbitrarily delayed the other "procedures required by law" to invoke a subsection (i) exception to the sixty-day rule; repeatedly extended comment periods to invoke a subsection (ii) exception to the sixty-day rule; and claimed that additional information has not been timely supplied by the applicant to invoke a subsection (iv) exception to the sixty-day rule.

29.     These other "procedures required by law" include consultations with the

National Marine Fisheries Service (NMFS) and U.S. Fish and Wildlife Service

concerning asserted (but non-existent) effects on assertedly present (but non-existent)

listed species; consultations with NMFS concerning asserted (but in fact inessential)

"Essential Fish Habitat;" and certification by the State of Alaska pursuant to § 401 of the

Clean Water Act, in violation of the Corps' regulation, 33 C.F.R. § 325.4(d)(4), that

states:

> Once the district engineer has sufficient information to make his public interest
> determination, he should decide the permit application even though other agencies
> which may have regulatory jurisdiction have not yet granted their authorizations,
> except where such authorizations are, by federal law, a prerequisite to making a
> decision on the DA permit application.

30.     The district engineer has had sufficient information to make his public

interest determination but has arbitrarily failed and refused to do so.

31.     As of the filing of this Complaint, it has been some 658 days since the

Corps first issued the July 31, 2020 public notice on IPOP's individual permit

application, an issuance premised on "receipt of all information required to be submitted

by the applicant in accordance with paragraph 325.1(d)".  33 C.F.R. § 325.4(d)(1).

32.     The resulting delay in permit processing is more than *ten times* the

presumptive sixty-day decision path, and the initial public notice was itself arbitrarily

delayed some 868 days after IPOP's initial APMA permit application.

33.     Pursuant to 5 U.S.C. § 555(c), Congress established a general statutory

rule that "[p]rocess, requirement of a report, inspection, or other investigative act or

demand may not be issued, made, or enforced except as authorized by law."

34.     The controlling permit regulations contemplate that the district engineer may seek "sufficient information to make his public interest determination".  The public interest factors which have delayed permit processing relate to asserted, but generally nonexistent, effects on fish and wildlife under the Endangered Species Act and Magnuson-Stevens Act.  Both statutes require decisions to be made upon the "best scientific . . . data available".  16 U.S.C. § 1536(a)(2) (Endangered Species Act); 50 C.F.R. § 600.920(d) (Magnuson-Stevens Act regulations).

35.     There is no general authority for the Corps to force applicants such as IPOP to gather basic scientific data, but IPOP has been repeatedly and unlawfully required to do so by defendants, imposing continuing irreparable injury.

### The Nationwide "Permit" System

36.     Pursuant to § 404(e) of the Clean Water Act, 33 U.S.C. § 1344(e), the Corps has authority to develop state, regional and nationwide permits for classes of activities which "are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment".

37.     As set forth below, the Corps has utilized extraordinary delays in issuing authorizations under these "permits" to impose multi-year delays in survey and assessment work deemed at times by the Corps to be a prerequisite for processing IPOP's individual permit for full-scale mining.

38.     The Corps repeatedly delayed authorization of core sampling activities under Nationwide Permit 6 ("NWP 6"), insisting for years that the Permit could only be

used when the Bonanza Channel was frozen solid, and issuing authorizations only after the ice melted.

### The Long Chronology of Abused Discretion and Arbitrary and Capricious Permitting Conduct

39.     IPOP first engaged competent, professional agents to secure necessary permits from the Corps in June of 2017.

40.     IPOP filed its first application on March 16, 2018.

41.     On April 4, 2018, IPOP delivered to the Corps additional information in support of a planned meeting.

42.     On April 13, 2018, the Corps met with both IPOP and project opponents and announced that it would refuse to accept the March 16, 2018 application, and that IPOP would also be unable to use the Corps' General Permit in place for 10" suction dredges on the theory that the Bonanza Channel habitat included mud flats and other features the Corps contended to be of particular value, as well as "Essential Fish Habitat".

43.     On or about April 15, 2018, IPOP submitted a draft evaluation of impacts on so-called "Essential Fish Habitat."

44.     On May 29, 2018, the Corps wrote to IPOP and confirmed that it would not accept the March 16, 2018 application, stated that an additional permit application would be required, and stated that additional separate submissions would be required for "verification" under NWP 6 for mineral exploration activities.

45.     On June 12, 2018, Corps Project Manager Leslie Tose visited the project site without any prior notice to IPOP, or opportunity to attend.

46.     On July 20, 2018, IPOP submitted a 45-page application and additional forms to the Corps seeking to conduct core sampling and a test dredging program under NWP 6 & 18/19.

47.     On August 31, 2018, the Corps responded that the application did not include a required "Mitigation Statement," was missing a list of contacts for federal recognized tribal governments, and demanded a "jurisdictional delineation" based on "the accurate description of Cowardin classifications present at the site."  The Corps deemed the application incomplete and closed the file.

48.     On September 4, 2018, IPOP provided the information sought by the Corps.

49.     On September 18, 2018, the Corps issued a "General Permit Agency Coordination" (GPAC) for the NWP 6 & 18/19 request for authorization.

50.     On October 25, 2018, Project Manager Tose advised IPOP that she had reviewed an advertisement promoting the project in the Alaska Miner's Association magazine, which she regarded as requiring additional information.

51.     On October 26, 2018, IPOP provided additional information in response to the Corps' October 22, 2018 request, explaining how a decision on the pending applications would address questions posed by the Corps and others.

52.     On November 29, 2018, IPOP provided detailed information concerning the fish and wildlife impacts of the NWP 6 & 18/19 request for authorization to NMFS, the U.S. Fish and Wildlife Service, and the Corps.

53.     The Corps' delay had now, in substance, wasted an entire year without permitting IPOP to do anything, in violation of its general and specific obligations to determine issues before it in a reasonable amount of time.

**2019**

54.     On January 18, 2019, Project Manager Leslie Tose told IPOP that (a) the Corps did not intend to issue any permit in 2019; (b) IPOP should relocate its mining operation to some alternative location; (c) the Corps did not consider IPOP to have an individual permit application pending for full-scale mining; (d) reiterated that preliminary work under NWP 6 & 18/19 the Corps was not approving was a prerequisite for the Corps being willing to accept the individual permit application; (e) stated that tribal consultations were required to issue authorizations under the nationwide permits; and that there was no time limit on how long such consultations could take; and (f) stated her personal opinion that the economic value of the mining did not exceed the environmental disturbance involved.

55.     On March 20, 2019, IPOP filed its application for an individual permit application for full-scale mining.

56.     On April 5, 2019, the Corps issued a decision on the July 20, 2018, NWP 6 & 18/19 application (which it called the July 25, 2018 application).

57.     IPOP promptly proceeded in mid-April 2019 to collect some thirteen core samples throughout the project area.

58.     On April 25, 2019, Project Manager Tose issued a letter deeming the March 20, 2019 individual permit application incomplete, reiterated the Corps' unreasonable demand that IPOP explain "why alternative locations in the vicinity of

Nome could not be used for your project," and announced that further action on the file was suspended.

59.     On April 26, 2019, IPOP attempted to appeal Project Manager Tose's April 5, 2019 determination to the Commander of the Alaska District. IPOP put the Corps on notice that it was violating the timeline requirements of 33 C.F.R. § 325.4;

60.     On May 10, 2019, the Corps responded to the April 26, 2019 request for an appeal by stating the determinations were not "considered appealable actions."

61.     On May 24, 2019, IPOP submitted eleven pages of additional materials in support of the March 20, 2019, application.

62.     On May 25, 2019, IPOP submitted an additional letter requesting the re-opening the individual permit file.

63.     On May 31, 2019, Project Manager Tose issued a letter to IPOP stating that IPOP's May 24, 2019 letter did not contain "the information requested" and the Corps was therefore closing the file.

64.     On June 23, 2019, IPOP sought to expand the core sampling permission to include additional mining claims to the east and to be allowed to utilize additional access points.

65.     That same day, IPOP submitted an additional letter to Project Manager Tose with additional information reporting that IPOP had but one day to collect data before the June 1, 2019 expiration date of the April 5, 2019, NWP 6 & 18/19 authorization, report turbidity measurements in the area and the results of preliminary core sampling.

66.     On June 27, 2019, IPOP submitted an additional letter to Project Manager Tose objecting to the May 31, 2019 letter as not specifying what additional information the Corps sought and requesting that the Corps identify the additional information needed.

67.     On July 16, 2019, IPOP wrote Project Manager Tose to complain of receiving no response to the June 23, 2019 submissions and providing further information about IPOP's core sampling activities.

68.     On July 16, 2019, IPOP also submitted a letter to Project Manager Tose reiterating the June 27, 2019 request for clarification as to what additional information the Corps sought, responding to various mischaracterizations of the project application, and responding to the Corps' demands for information concerning mitigation

69.     On August 12, 2019, the Corps reported that it would shortly issue a General Permit Agency Coordination (GPAC) notice concerning the additional sampling and access points.

70.     On August 23, 2019, the Corps issued the GPAC notice.

71.     On September 11, 2019, the Corps responded to IPOP's May 25, 2019 and July 16, 2019 letters by providing a "Drawings Checklist" pursuant to which the Corps sought extraordinarily detailed information including such things as "specific locations of sequenced cuts or passes, and specific dimensions of cuts and volumes of dredge and discharge activities".  Upon information and belief, no other suction dredge miner in Alaska has ever been required to provide such information and the Corps routinely issues public notices without such detailed information.

72.     The letter claimed that IPOP had not provided sufficient information showing the presence of gold and reiterated its demand that IPOP explore "other claims or land available in the vicinity of Nome that could support your project purpose of gold mining".

73.     Further, on September 11, 2019, the Corps also demanded that IPOP engage a "qualified individual" to conduct an eelgrass survey "during a time period when vegetation, if present, is present in sufficient quantities to be observable in the project area".

74.     On October 4, 2019, Project Manager Tose wrote to IPOP concerning the proposal to explore eastern block claims asserting possible effects on "subsistence activities," suggesting that access to the eastern claims was an issue, and proposing to further limit the exploration window for NWP 6 & 18/19 activities to April 1 through May 31.  The letter warned that some of the concerns expressed by commentators "appear to this office to be substantive," suggesting that IPOP respond, but the Corps did not say which concerns those were.

75.     By a letter dated November 2, 2019, IPOP responded to the October 4, 2019[h] letter explaining in still further detail how IPOP could access the eastern claims and requesting that the Corps host a meeting of IPOP representatives and the tribal persons and entities making claims of subsistence impacts to flesh out those claims and address them.  No response to this request was ever received.

76.     By letter of November 5, 2019, IPOP responded with an additional ninety-six pages of information in response to the Corps' September 11, 2019 letter.

77.     The November 5, 2019 letter requested that the Corps supply National Marine Fisheries  ("NMFS") with specific materials and request early consultation with NMFS pursuant to 50 C.F.R. § 600.920(a)(3), pointing out that "relatively simple actions involving minor adverse effects on EFH,( Essential Fish Habitat) the assessment may be very brief".

78.     On December 5, 2019, the Corps issued a letter authorizing the additional exploration of the eastern block of claims but continued to impose the dangerous "ice-bound conditions" limitation.

79.     On December 13, 2019, IPOP proposed to amend the authorization to allow additional core sampling and noted problems with the conditions in the December 5, 2019 authorization and asked that the problem conditions be removed.

**2020**

80.     On January 31, 2020, the Corps issued another letter claiming that IPOP had failed to provide sufficiently detailed "dimensional plans" and otherwise failed to comply with unspecified requirements set forth in the Corps' prior letters dated May 29, 2018, April 25, 2019, and September 11, 2019.

81.     On February 5, 2020, the Corps issued a letter seeking additional clarification of IPOP's proposed core sampling expansion of December 13, 2019, deeming the application incomplete.

82.     That same day, the Corps issued a second letter concerning the ESA and EFH consulting processes, acknowledging (three months after the request) that IPOP was "requesting early initiation of the EFH consultation process."  Upon information and belief this was the first time the Corps had reviewed IPOP's draft EFH assessment that

had been delivered to the Corps back in April of 2018.  The Corps recommended that IPOP once again "update the application materials" without any specification of the desired updates.

83.     On February 10, 2020, retransmitting a corrected February 7, 2020 letter, IPOP provided additional information concerning its December 13, 2019 proposal to expand core drilling, and noting the continuing unworkability of the conditions in the NWP 6 & 18/19 authorization, pointing out that they conflicted with the regional permit conditions generally imposed by the Corps.

84.     On March 25, 2020, IPOP transmitted an additional letter noting that there was still no decision on IPOP's December 13, 2019 request and asking the Corps to waive any fourteen-day advance notice requirement because the ice was melting.

85.     On April 7, 2020, IPOP transmitted an additional letter, providing still further specificity concerning the core sampling authorization request, and reiterating its request for a waiver of the fourteen-day advance notification period.

86.     On April 13, 2020, the Corps, by e-mail, raised questions about the use of snowmobiles on the project asking for information about the snowmobile model numbers and noise levels associated with their use.  Upon information and belief, this is the only time in the history of federal regulation of activities in Alaska (at least those not involving any critical habitat for noise sensitive species, the case here) that the Corps has ever requested such information of an applicant.  IPOP responded the same day.

87.     On or about April 24, 2020, IPOP advised that ice conditions had now deteriorated to the point where it was too risky to conduct core sampling and pointed out that the Corps had yet to issue a workable permit for such sampling.  IPOP asked the

Corps to focus on simply expediting the individual permit application because IPOP was ready, willing, and able to commence mining on June 1, 2020.

88.     On April 30, 2020, following up on the Corps' February 5, 2020 suggestion to "update the application materials," IPOP e-mailed a revised application form, accompanying it with a comprehensive two hundred and twenty-eight page "2020 Narrative and Plan of Operations."

89.     On May 4, 2020, after it was no longer possible to core in "ice bound conditions," the Corps finally issued its authorization under NWP 6 for additional core sampling.

90.     On or about May 8, 2020, Project Manager Tose provided an outline to IPOP of additional permitting tasks, taking the position that the application was not yet complete, pointing out related agency timelines involved, and demanding that IPOP prepare Biological Opinions for the U.S. Fish and Wildlife Service and NMFS, as well as writing an EFH assessment (ignoring the one that had been provided to the Corps in April of 2018).

91.     On or about June 4, 2020, the Corps demanded that IPOP prepare "numbered plan sheets, with title blocks," reiterated the (previously answered) questions about avoiding and minimizing impacts, added a question about compensatory mitigation, and sought the names and addresses of adjoining landowners.

92.     Within the arbitrary limitations of its NWP authorizations, IPOP conducted a number of surveys in the summer of 2020.  These surveys included bathymetric mapping of the claim area; seagrass identification and mapping of the claim area; baseline studies including water chemistry, water flow measurements, turbidity

measurements, sieve analysis of bottom muck, and bird nest surveys on the shores

adjacent to and on islands within the claim area; a model dredge program/study to

examine the effects and extent of turbidity caused by dredging and the ability of the silt

curtains to contain the turbidity; a fish exclusion test using a silt curtain; preliminary fish

surveys; and benthic invertebrate sampling and identification.

93.     By letter dated July 3, 2020, IPOP submitted a Revised and Expanded

Mitigation Statement and other information requested by Project Manager Tose.

94.     On July 31, 2020, Project Manager Tose finally issued public notice on

IPOP's individual permit application.

95.     On August 7, 2020, Project Manager Tose was quoted in the Nome

newspaper offering extensive and detailed advice to project opponents as to how to make

comments on the project that the Corps would regard as substantive.

96.     On August 18, 2020, IPOP e-mailed a Bonanza Channel Bathymetric

Mapping and Seagrass Study to the Corps and fish and wildlife agencies, showing that

there was no eelgrass in the area IPOP proposed to dredge, and almost none in the

Bonanza Channel.  The only vegetation in the areas that plaintiffs proposed to mine was

three species of pondweed generally recognized as fast-colonizing invasive species.

97.     On or about August 17, 2020, IPOP commenced the test dredging project,

proving that turbidity was minimal and could be contained with the silt curtain

technology IPOP had purchased for the purpose.

98.     On August 28, 2020, the Corps extended the public notice period on

IPOP's individual permit application to September 15, 2020.

99.     In late August 2020, Project Manager Tose was replaced with Project Manager Tiffany Kwakwa, for reasons unknown to plaintiffs.

100.     By letter dated September 15, 2020, IPOP submitted to the Corps the Model Dredging Program Baseline Studies containing the results of the test dredging

101.     On September 15, 2020, the Corps expanded the public notice period on the individual permit to September 30, 2020.

102.     By letter dated September 24, 2020, some 324 days after IPOP had requested that the Corps expedite the EFH process, the Corps purported to designate IPOP as the "non-federal representative to conduct EFH consultation."

103.     By letter dated October 29, 2020, the Corps transmitted a number of agency letters providing comments on IPOP's individual permit application, specifically requesting that IPOP address a twenty-five page, single-spaced typed list of issues, and stating that the "concerns expressed by NMFS, USFWS and USEPA appear to this office to be substantive".

104.     By letter dated November 9, 2020, IPOP requested additional flexibility in core sampling and sought additional core sampling locations.

105.     By letter of November 10, 2020, IPOP responded to the Corps' October 29, 2020 letter transmitting agency comments by responding directly to the agencies and copying the Project Manager.

106.     A conference call was held between the Corps and IPOP on November 19, 2020 to discuss IPOP's pending NWP 6 re-verification request for additional core sampling, but the Corps offered no solutions to speed the process up.

107.    On December 8, 2020, in another teleconference, the North Central Section Chief, Ms. Ellen Lyons, presented what she called "only two paths forward". The first involved IPOP withdrawing its permit application to allow further core sampling when, and if, the Corps authorized it in a workable fashion, and the second involved the Corps making a permit decision with the available data.

108.    On December 9, 2020, IPOP delivered an additional letter concerning the "alternatives" issue and the degree to which the Corps was unlawfully ignoring IPOP's project purpose.

109.    On December 10, 2020, IPOP presented the proposal to the Corps and others that would relocate the first summer's operations out of the main portion of the Bonanza Channel, between two islands where operations could be more easily and effectively isolated from the rest of the Channel.   This would provide a full-scale test under more controlled circumstances and gather additional data for adaptive management of further operations.

**2021**

110.    On January 8, 2021, Corps Project Manager Kwakwa issued a another GPAC notice to agencies including NMFS and the U.S. Fish and Wildlife Service concerning IPOP's NWP 6 reverification request.

111.    On January 8, 2021, the Regional Regulatory Chief of the Corps wrote to IPOP providing a "written summary of the November 19, 2020, teleconference meeting," characterizing it as addressing IPOP's ongoing requests for NWP 6 authorization (called "reverification"), and now claimed that the reporting concerning mineral resources was "not sufficient to make a determination on identifying the least environmentally

practicable alternative (LEDPA)".  The regional Regulatory Chief suggested that IPOP withdraw its application and reapply.  Regardless, he promised to make a decision in thirty days if the Corps did not receive the outstanding information it had previously requested.  The Corps copied numerous project opponents with the letter.

112.     On February 1, 2021, IPOP presented a more detailed version of its previously submitted proposal for modification of the first summer's operations.

113.     On January 13, 2021, Project Manager Kwakwa informed IPOP that she was re-initiating ESA consultations concerning the project.  Upon information and belief, she did not do so.

114.     Instead, on January 29, 2021, the North Central Branch Chief, Ellen Lyons, wrote IPOP to "reconfirm" IPOP as the Corps' "non-federal representative" for the consultations.

115.     On February 8, 2021, IPOP wrote to the Corps and provided an additional seventy-nine pages of responses to the Corps' October 29, 2020 letter and thirty-six pages of responses to the January 8, 2021 letter.

116.     On February 10, 2021, IPOP e-mailed a revised Reclamation Plan to the Corps comprising some forty pages.

117.     Also, on February 10, 2021, IPOP e-mailed a Biological Assessment to the Corps, comprising some sixty-eight pages.

118.     On February 12, 2021, ignoring IPOP's presentation of the limited summer operations as a "proposal" for discussion to address concerns, the Corps determined to treat it as a "revised permit application," declared it would require public notice, and declared that the information was not complete enough to provide public

notice.  Among other things, the Corps sought additional drawings. The Corps also required IPOP to immediately prepare and submit a § 401 certification request to the State of Alaska.

119.    On February 16, 2021, IPOP e-mailed a revised Essential Fish Habitat Assessment to the Corps, comprising some thirty-six pages

120.    On February 18, 2021, IPOP wrote the National Marine Fisheries Service to reinitiate informal ESA consultations on IPOP's NWP 6 reverification request.  By now, the level of information required for NMFS to determine that non-existent listed species in the frozen-solid area would not be jeopardized had reached 101 pages.

121.    IPOP issued a parallel letter the same day to the U.S. Fish and Wildlife, now reaching 99 pages to discuss the effects on non-existent listed species.

122.    On March 8, 2021, IPOP wrote to NMFS and the USFWS, pointing out that its NWP 6 reverification request had been pending for 119 days since its November 9, 2020 submission to the Corps and that the ice was about to melt for the second year in a row while the agencies sat on the authorizations

123.    By letter dated March 8, 2021 (retransmitted as corrected on March 10, 2021), IPOP offered a more detailed response to the Corps' January 8, 2021 assertions concerning a lack of "community dialog."

124.    By now, if not sooner, IPOP had concluded that the project opponents had hidden motives, having been told by project supporters in Nome that project opponents hoped to drive IPOP from Alaska and salvage its equipment to dredge the gold for themselves.  IPOP had concluded that what was really going on, with the witting or unwitting collaboration of the Corps, was that the Bering Straits Native Corporation,

owner of Alaska Gold LLC, and the owner of 69,000 acres of mineral rights adjacent to IPOP's, was trying to exercise control over the lands and/or mineral rights it had given up in a 1979 settlement agreement with the State of Alaska, and which IPOP now leased.

125.     Also, on March 8, 2021, IPOP transmitted by e-mail detailed wetlands mapping information to the Corps.

126.     On March 11, 2021, the Corps devised yet another technique for delay. The Corps advised that it would reject IPOP's Biological Assessment (BA) because it addressed both the effects of the NWP 6 core sampling work and the larger full-scale mining work.  The Corps demanded that the information be separated before consultations could proceed and sought other clarifications concerning the BA

127.     On March 12, 2021, IPOP, having determined to acquiesce in the Corps' recharacterization of IPOP's proposal for discussion as an amendment to the application, provided 45 pages of additional information concerning the proposed first summer's operations.

128.     On March 18, 2021, IPOP wrote to the highest ranking Alaskan officials of the Corps, NMFS, and the U.S. Fish and Wildlife Service to complain about the staggeringly arbitrary and capricious unwillingness of the agencies to simply bring the NWP 6 reverification process to a close, correctly stating:  "we are talking about punching holes less than 3" in diameter in an estuary which is frozen solid and essentially lifeless at the moment," and that one could with "very little effort" simply re-issue the prior conclusion that IPOP sampling efforts are not likely to adversely affect marine mammals that are "currently frozen out of the Channel".

129.    On March 25, 2021, IPOP provided seventy-five pages of additional material concerning the individual permit application.

130.    On April 6, 2021, the Regional Regulatory Chief responded to IPOP's March 18, 2021 letter blaming IPOP for the delay, reiterating the claim that defects in the Biological Assessment were causing problems even though IPOP had subsequently provided focused, standalone packages for the NWP 6 reverification process on February 18, 2021, as pointed out in the March 18, 2021 letter.

131.    On April 16, 2021, the Corps issued another public notice for the individual permit application based on its position that renewed notice was required by the revised first year operations.

132.    In the meantime, even though IPOP had never received the additional NWP verification it sought, it did attempt to engage in core drilling in April 2021 under the prior authorization, only to be set back by bad weather and equipment failures.

133.    The resulting twenty-eight page April 2021 report of the professional marine mammal observer confirmed the obvious fact that the Bonanza Channel was "continuous, snow-covered ice with no open water leads," and that "[g]iven that the water depth is typically 1 to three feet . . . and the ice was likely bottom fast at this location, no seals were expected".   None, of course, were seen.

134.    No IPOP representative has ever seen any ESA listed species present on IPOP's mining claims throughout the permitting process, and upon information and belief, neither has anyone else.

135.   IPOP has no remedy at law for the Corps' unauthorized forcing of such expenditures as the non-existent seal report, and suffers irreparable injury with each additional illegal requirement imposed by the Corps.

136.   On May 3, 2021, after the disappearance of the ice-bound conditions required by the authorization, the Corps finally issued the NWP 6 reverification.

137.   On May 10, 2021, IPOP delivered to the Project Manager a revised Biological Assessment focused only on the individual permit.  IPOP also sent notes by e-mail that same date to highlight the changes in the Biological Assessment for the benefit of the Project Manager.

138.   On May 10, 2021, the Corps issued a public notice extending the comment period on the April 16th public notice until June 1, 2021.

139.   On or about May 11, 2021, IPOP delivered to the Project Manager a twenty-seven page Dredging Environmental Management Program (DEMP).

140.   On May 26, 2021, IPOP e-mailed 359 pages of appendices from the Biological Assessment to the Project Manager.  Although these were documents that had previously been provided to the Corps, Project Manager Kwakwa had demanded, in substance, that they be re-sent, labelled as the Appendices.

141.   On May 28, 2021, IPOP initiated an additional request for reverification of NWP 6 authority to provide clearer federal coverage for summer/fall core sampling activities, reporting that IPOP would forward an additional Biological Assessment associated with such work

142.   On June 17, 2021, Project Manager Kwakwa wrote to IPOP seeking, among other things, all of the information already on file with the Corps concerning the

prior reverifications (e.g., "the name, address telephone number and e-mail address of the prospective permittee"), as well as other information.

143.    On June 18, 2021, understanding that the Corps appeared to give credit to any unsupported assertion made by project opponents, IPOP delivered to the Corps a purported scientific analysis of a totally dishonest campaign run by project opponents called "Keep Birds Safe in Safety Sound."  The absurdity of the use of this study to thwart the project is evident as IPOP's project does not involve any operations in Safety Sound, and the specific claims about the presence of specific birds highlighted in the campaign were provably false.

144.    On June 24, 2021, Project Manager Kwakwa finally transmitted the Biological Assessment, a serviceable version of which was first provided back on February 15, 2021, to the U.S. Fish and Wildlife Service to commence ESA consultations.

145.    On June 28, 2021 (by letter dated June 21, 2021), IPOP transmitted approximately 454 pages of additional responsive materials to the Corps:

146.    On July 6, 2021, Project Manager Kwakwa finally transmitted the Biological Assessment to NMFS to commence ESA consultations.

147.    By letter of July 16, 2021, IPOP requested that the Corps cease using the term "Safety Sound" with respect to the project as it was misleading the public.

148.    Also, on July 16, 2021, IPOP undertook to answer, by e-mail, some of the questions Project Manager Kwakwa had concerning the summer/fall coring application.

149.    On July 19, 2021, the Corps issued the public notice on the summer/fall core sampling request.

150.     On July 21, 2021, IPOP circulated to the Commander of the Alaska District and others links to two short videos of high resolution drone footage showing the mining area's desolate nature, naturally turbid conditions, and footage and photos showing the frequent submergence of the islands under some weather conditions and the emptying out of the entire Channel under others.

151.     On July 28, 2021, Project Manager Kwakwa e-mailed IPOP that the Corps expected to travel to Nome in September and "would be happy to meet with IPOP at the project site."

152.     On July 29, 2021, the Corps finally transmitted to IPOP the comments on the project that it had received back during the time period May 19th through June 1st, and providing a nine-page, single-spaced list of issues to be addressed by IPOP, most of which had already been repeatedly addressed.  The Corps also declared that this "is not a complete list and responding to other comments within the letters in a meaningful way that provides additional information to the Corps for their [*sic*] permit decision making process is recommended."  The letter also stated that the Corps did not find any of the large number of letters supporting the project to be "substantive."

153.     On August 9, 2021, IPOP requested an agenda for the Corps trip and expressed interest in attending any meetings the Corps would be having in Nome concerning the project, inasmuch as the Corps had declined previous requests to facilitate a meeting with project opponents.  Project Manager Kwakwa responded the next day that the Corps was still finalizing the details and would share the details when available.

154.     On August 11, 2021, Project Manager Kwakwa responded to the July 16, 2021 e-mail asking further questions about the summer/fall core sampling request.  Many

of the inquiries were irrational, e.g., about environmental impacts of "drilling muds" which IPOP had previously explained had nothing to do with pushing PVC pipes into sand and gravel.

155.    The letter also announced that IPOP would be required to split its EFH Assessment into multiple documents at the arbitrary and capricious whim of the Corps, signaling to IPOP that no progress whatsoever had been made on the EFH consultation process.

156.    As the summer was rapidly passing, and IPOP had obtained Alaska Fish and Game authorization to conduct the summer/fall sampling, IPOP sent the Corps on August 11, 2021, notice of its intention to do so.

157.    On August 12, 2021, Project Manager Kwakwa responded that the Corps would not allow what was expressly allowed in the May 3, 2021 authorization because the project description referred "ice bound conditions," and that IPOP was therefore "not authorized to proceed until ice bound conditions exist."

158.    On August 19, 2021, IPOP objected to this determination, and offered to limit the number of holes to ninety to accelerate the issuance of the authorization, objected to the lack of progress on EFH, and noted that emerging focus on turbidity arising from the need to anchor the pontoon boat from which the core samples would be collected was arbitrary and capricious for reasons stated in the letter.

159.    On August 30, 2021, IPOP responded to the comments transmitted by the Corps on July 29, 2021, identifying for the Corps' benefit precisely how all those issues had already been addressed in prior communications with the Corps and providing sixty-six pages of responsive material.

160.     On August 30, 2021, Project Manager Kwakwa wrote to IPOP declaring that the summer/fall core sampling request failed to use "all practicable measures to ensure impacts that are no more than minimal"—ignoring the entire regulatory and legal context of Nationwide Permits which is to authorize in advance identified classes of activities that *are* minimal.  She sought additional responses to comments.

161.     On August 31, 2021, the Corps wrote to advise IPOP that the Nome site visit had been cancelled; IPOP responded on September 7, 2021, proposing a "virtual site visit" and an additional meeting on the Corps' irrational insistence that mining somewhere else was a practicable alternative.

162.     On September 7, 2021, IPOP responded to the August 30, 2021 letter, reminding the Corps that the project was pre-authorized under NWP 6, and the only relevant condition was one requiring IPOP to avoid "spawning areas during spawning seasons"—of which there were none.

163.     The letter also transmitted an additional scientific study which had been unlawfully demanded by the Corps, the "2021 Field Survey and Desktop Study," which analyzed water flows in the project area to confirm what had at all times been obvious: any turbidity generated by the project could not travel far because of the low flows and shallow water.

164.     By e-mail of September 13, 2021, Project Manager Kwakwa responded to IPOP's September 7, 2021 e-mail, complaining that IPOP had failed to provide information "regarding case study alternatives analysis," referring to the plan to isolate first summer operations for study purposes.  In other words, the Corps was now seeking

alternatives to the alternative that IPOP had first presented provided back on December 20, 2020.

165.    By letter dated September 13, 2021, IPOP wrote to the Commander of the Alaska District complaining that the cancellation of the Nome trip "follows a lengthy pattern on the part of the Corps' representatives of not only refusing to meet, but also refusing any meaningful dialog with [IPOP's] permitting personnel to move the permitting process forward efficiently.

166.    The Commander never responded to this letter or any of the several other letters to him by IPOP.

167.    On September 15, 2021, Project Manager Kwakwa finally initiated consultations with NMFS concerning IPOP's request to expand NWP 6 verification to include summer/fall sampling.

168.    On September 17, 2021, IPOP responded to Project Manager Kwakwa's September 13, 2021 e-mail, reviewing the history of the Corps' repetitive inquiries on this subject as "form of regulatory abuse," and stating that "if the Corps wishes to deny the permit on the basis that IPOP has not rebutted the (inapplicable) regulatory presumption that LEDPA exists, let the Corps issue its determination on that basis so that the matter can be put in court".

169.    By letter dated September 16, 2021, but delivered on or about September 24, 2021, IPOP wrote to the Project Manager concerning the Corps' continuing unwillingness or inability to authorize mineral exploration work of negligible environmental impacts, providing proposed dates for a "virtual site visit," and [re-transmitting] the forty-seven page "2021 Field Survey and Desktop Study".

170.    On September 27, 2021, IPOP provided the Corps with further information concerning the "alternatives" issue and LEDPA.

171.    On September 28, 2021, IPOP learned that instead of working to process the summer/fall application, the Corps was seeking to amend the prior May 3, 2021 NWP 6 authorization to remove the language upon which IPOP had relied in seeking Alaska Department of Fish and Game approval for the work.

172.    On October 6, 2021, IPOP e-mailed the Project Manager with additional information concerning fish sampling at the project site.  No salmonid species were captured, with most captures constituting common stickleback.

173.    The October 6, 2021 e-mail also provided the results of yet another unlawful study demanded by the Corps, this time requesting an "Environmental DNA" or eDNA test for the presence of red crab in the Channel waters, even though the area in which IPOP proposed to operate was not within any identified EFH for red crabs. Naturally, no red crab DNA was identified, though the tests are so sensitive it would have been essentially meaningless if the DNA had been detected.

174.    By letter of October 20, 2021, the Corps finally addressed the outstanding EFH delay by claiming that the existing EFH Assessment was "incomplete."  The letter was full of false or misleading information and provided twelve single-spaced pages of demands for changes to the Assessment.

175.    On October 21, 2021, the Corps issued its decision modifying the May 3, 2021, authorization to remove the language upon which IPOP had relied.

176.    On October 22, 2021, IPOP pointed out that it had been 146 days since IPOP had sought the summer/fall authorization, and advised that IPOP could not obtain

insurance to conduct sampling on the ice given the experiences during the onset of warming the prior spring.  IPOP sought immediate approval to conduct activities during the limited window of workable weather as the Alaskan winter closed in again.

177.    On October 25, 2021, IPOP advised the Corps that notwithstanding the totally unnecessary nature of the demands for change in the EFH Assessment, it would make them; renewed its inquiries about the ESA consultations; and acknowledged an October 19, 2021 invitation from the Corps to meet in Nome (but not at the project site).

178.    With the letter, IPOP transmitted (1) an additional bird study; (2) an analysis of total organic carbon at the site, confirming its very low productivity; (3) additional information concerning environmental variables at the site, confirming its incompatibility with salmon; and (4) an updated survey of submerged aquatic vegetation.

179.    On October 27, 2021, IPOP sent a representative to meet with the Corps in Nome, who was relegated to a brief interaction in the hotel lobby in which he presented the results of the summer 2021 research, which results were rejected out of hand by at least one representative of the Corps, Ms. Ellen Lyons, North Central Section Chief and the Project Manager's supervisor.

180.    On October 29, 2021, the Commissioners of the Alaska Department of Natural Resources, supported by the Commissioner of the Alaska Department of Environmental Conservation, who were both concerned over the lack of progress in IPOP's permit application, sought a meeting with the Commander of the Alaska District. Though a meeting was scheduled for December 17, 2021, the Commander did not attend, and as of the filing of this complaint, the Commander has only been willing to meet with project opponents.

181.    On November 10, 2021, a conference call was held between the IPOP and Corps permitting personnel in which the Corps finally appeared to back off its arbitrary, capricious, and illegal "just dredge somewhere else" position, and now pivoted to complaining of imagined defects in IPOP's twenty-six page alternatives analysis, which the Corps had had since May 2020 without raising any questions.

182.    For example, the Corps now insisted that IPOP evaluate old technologies for dredging such as "bucket-line dredges".  The Corps, which dredges rivers and harbors across the entire United States, is familiar with all varieties of dredging equipment and knows that bucket line dredging technology would involve slower operations, higher energy use and higher environmental impacts.  Upon information and belief, the Corps has never insisted that environmental analyses of any other dredging project in the entire United States analyze bucket line dredge technology as a reasonable alternative.

183.    The Corps' position was not merely arbitrary and capricious.  Inasmuch as the Corps knew that IPOP had already shipped its advanced suction dredge technology to Nome at enormous expense, the demand that IPOP consider using inferior equipment as an alternative is best understood as a form of harassment.

184.    On November 19, 2021, IPOP transmitted a 2021 SAV Recovery Report, showing underwater footage and other evidence that the locations where IPOP had test dredged in the summer of 2021 were now indistinguishable from the rest of the bottom of the Bonanza Channel, and thickly covered with the invasive pondweeds that appear in late summer and early fall

185.    In a separate letter of the same date, IPOP transmitted a fifty-seven-page revised EFH Assessment.

186.    On November 19, 2021, IPOP wrote to the Commander to provide background information concerning the lack of progress in EFH consultations, requesting that he "investigate the appropriate scope of EFH consultations with NMFS and the degree to which continuing assertions by NMFS and the Corps of informational inadequacy are justified".

187.    On November 30, 2021, IPOP wrote to the Commander to provide background information concerning the ongoing "alternatives" issue and its evolution over time as a primary instrument of delay by the Project Manager and her supervisor.

188.    On December 13, 2021, after the summer/fall conditions were over, the Corps finally issued its NWP 6 authorization for summer/fall work.  The Corps then declared that that the permit it had just issued would expire in ninety-five days, on March 18, 2022, before the ice could melt for summer/fall work.

189.    On December 15, 2021, IPOP responded to the demands of the Corps' December 13, 2021 letter, transmitting six pages of additional information on alternatives (such as bucket line dredges), a fifty-one page revised reclamation plan, proposed performance standards, and an eighty-one page revised summary report.

190.    Because the Commander of the Alaska District was unwilling to meet with the Alaska Commissioners and IPOP (though the meeting was to be held by web conferencing), the Commissioners and IPOP instead met with the Chief of the Regulatory Division of the Alaska District, Mr. David Hobbie and his subordinate Ms. Shannon Morgan on December 17, 2021.  At the meeting, Mr. Hobbie promised to have additional information on potential demands for "compensatory mitigation" delivered to IPOP by

the end of January, and that after IPOP responded to those demands, a permit decision would be made in a "few days".  That would not come to pass either.

191.    By letter of December 21, 2021, IPOP sent the Regulatory Division Chief a letter explaining why no compensatory mitigation could be required for the temporary and minor impacts of the project under the Corps' policies and regulations.

**2022**

192.    On January 4, 2022, the Corps finally completed its review of IPOP's EFH Assessment first transmitted to the Corps in a serviceable form on April 15, 2018, and transmitted it to NMFS with its conclusion that the project "would have adverse effects on EFH, especially for Chum salmon and its prey".

193.    On January 11, 2022, IPOP sent the Corps a revised Dredging and Environmental Management Plan.

194.    On January 20, 2022, IPOP wrote to the Regulatory Division Chief reporting that its efforts to set up a meeting as requested on December 21, 2021 had not succeeded, and asked the Corps to supply any scientific information that it has to suggest that there was any issue with the regrowth of the invasive pond weed, the temporary loss of which was the only impact of potential regulatory significance.

195.    On January 27, 2022, the Corps advised IPOP that it had concluded that no compensatory mitigation would be required unless "additional information" emerged, stating that the determination "was predicated on the assumption that a sufficient reclamation plan approved by the State and the Corps prior to initiation of work that would be authorized by the DA permit, if issued."  The Corps referred to "continuing to work with [IPOP] to provide information necessary to reach permit decisions."

196.    That same day, IPOP reminded the Corps of its promise to make the permit decision within "a few days," reminded the Corps that it had the reclamation plan which had been repeatedly revised in response to Corps demands, most recently on December 15, 2021, and sought clarification as to the Corps' position.

197.    That same day, IPOP met with representatives of the Corps and NMFS in another attempt to present the scientific evidence concerning the poor quality of the Bonanza Channel in relation to the EFH claims of the Corps.

198.    On February 1, 2022, Project Manager Kwakwa e-mailed IPOP to advise that the Corps was preparing a more detailed response to assist with providing a reclamation plan that can be approved by the Corps and requesting a meeting on the subject.  She also reported that she could not find the Model Dredging Program report that had previously been transmitted to the Corps on September 14, 2020, and again in January, 2020.  IPOP retransmitted the report that same day.

199.    This was the [third] time IPOP had transmitted the basic survey research that the Corps had unreasonably insisted upon, and by all appearances, the Corps had never reviewed any of the supplied information.

200.    This conclusion was corroborated when Project Manager Kwakwa advised by e-mail of February 2, 2022 that one of the tables was not legible; IPOP transmitted a revised version on February 4, 2022.

201.    On February 9, 2022, the Corps advised IPOP that it had determined that IPOP's reclamation plan, which according to the letter had been submitted fifty-eight days before, was "insufficient," and asked for still further revisions.

202.     On February 24. 2022, IPOP provided the Corps with a revised reclamation plan.

203.     On March 8, 2022, IPOP representatives met with Corps permitting personnel, to be told that the Corps would once again demand further revisions to the plan and additional information concerning alternatives.

204.     On March 31, 2022, IPOP transmitted a further revised reclamation plan and additional alternatives analysis to the Corps.

205.     On April 5, 2022, IPOP transmitted further research to back up the position, obvious to anyone familiar with the biology of cold-water salmonid species, that the Bonanza Channel was too warm in the summer for juvenile salmon habitat.

206.     On April 6, 2022, the Alaska Department of Environmental Conservation issued its certification for the project under § 401 of the Clean Water Act.

207.     On April 13, 2022, the Corps advised IPOP that it had no questions concerning the revised reclamation plan and alternatives analysis.

208.     At this juncture, IPOP has no confidence that the Corps will ever complete the permitting process without a judicially-ordered deadline, and expects that, without judicial supervision, the Corps will continue to request additional information not reasonably required to make a permit decision for which it may not even actually utilize in decision making.

209.     Injunctive relief is required to avoid continuing irreparable injury to plaintiffs as plaintiff Abell is eighty-four years old.  He, and many investors in the project, may well die before IPOP ever commences operations, and their abuse at the hands of defendants cries out for a remedy.

## CLAIM FOR RELIEF:  ADMINISTRATIVE PROCEDURE ACT

210.   Plaintiff realleges paragraphs 1 through 209 as if set forth herein.

211.   5 U.S.C. § 706 provides that the District Court has the authority to compel

a federal agency to take action upon the submitted permit.

212.   5 U.S.C. § 706 states:

> § 706. Scope of review
> To the extent necessary to decision and when presented, the
> reviewing court shall decide all relevant questions of law,
> interpret constitutional and statutory provisions, and
> determine the meaning or applicability of the terms of an
> agency action. The reviewing court shall--
> (1) compel agency action unlawfully withheld or
> unreasonably delayed; and …5 U.S.C. § 706

213.   The Corps is unlawfully withholding and unreasonably delaying a permit

decision for IPOP.

214.   The Corps has failed to take a discrete agency action that it is required to

take and the plaintiffs are entitled to an Order compelling the Corps to take action upon

IPOP's permit.

215.   The Corps' continuing failure to reach a permit decision is causing

continuing and irreparable injury to IPOP.

216.   The plaintiffs seek an Order compelling the Corps to make a final decision

regarding the evaluation of the permits requested by IPOP pursuant to 5 U.S.C. § 706(1)

that mandates that the District Court shall "compel agency action unlawfully withheld or

unreasonably delayed."

WHEREFORE, plaintiffs respectfully pray for an Order or Judgment compelling defendants to cause a final decision to be made on the permit within thirty days, and such other and further relief as may be just and proper.

DATED:  May 20, 2022.

Respectfully submitted,

**MILLER, SULLIVAN & DEMARCAY, LLC**

**LAWRENCE R. DeMARCAY, III (#25379)**
1100 Poydras Street, Suite 1515
New Orleans, Louisiana 70163
P.504-708-1300
lrd@msdnola.com

and

**Chris M. Trepagnier (#25528)**
**THE TREPAGNIER LAW FIRM, APLC**
215 West Beach Parkway
Mandeville, Louisiana 70448
P. 985-778-0888
chris@treplawfirm.com

Attorneys for Plaintiffs