# IN THE UNITED STATES DISTRICT COURT

# FOR THE WESTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| **EDWARD C. ABELL; ELAINE ABELL; IPOP, LLP and RIVERS OF GOLD, GLOBAL TV SHOW, GLOBAL MERCHANDISING LP** | |
| | **CIVIL ACTION** |
| **v.** | |
| | **CASE NO: 22-CV-1353** |
| **U.S. CORPS OF ENGINEERS*;* CHRISTINE WORMUTH, in her official capacity as United States Secretary of the Army; and SCOTT A. SPELLMON, in his official capacity as Chief of Engineers and Commanding General of the U.S. Corps of Engineers** | **JUDGE JAMES D. CAIN, JR.** |
| | **MAGISTRATE JUDGE CAROL B. WHITEHURST** |

## EDWARD C. ABELL, ELAINE ABELL, IPOP, LLP and RIVERS OF GOLD, GLOBAL TV SHOW, GLOBAL MERCHANDISING LP'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO TRANSFER TO THE DISTRICT OF ALASKA

**NOW INTO COURT,** through undersigned counsel, come Plaintiffs, Edward C. Abell; Elaine Abell; IPOP, LLC and Rivers of Gold, Global TV Show, Global Merchandising LP (collectively referred to as "IPOP" or "Plaintiffs"), who submit this Memorandum in Opposition to Defendants' Motion to Transfer to the District of Alaska. IPOP seeks to preserve venue in Louisiana in the interest of justice to avoid local permit discrimination as the cultural, social, political, and economic forces in Alaska, that are dominated by IPOP's Alaska based mining competitors who oppose the granting of the referenced permit, create a situation where IPOP is unable to obtain a fair hearing of the issues alleged in the Complaint if the case is transferred to Alaska.

# Table of Contents

Table of Contents ...................................................................................................... 2

Table of Authorities ................................................................................................ 3

Argument .................................................................................................................. 4

The interests of justice mandate that this matter remain in the Western District of Louisiana as IPOP is unable to obtain a fair trial in Alaska due to discrimination based upon the economic, cultural, and political pressure from Alaskan special interest groups that consist of competing miners posing as environmental activists while they mine resources from adjacent lands. ................................................................... 4

The Corps is required to process a permit application within sixty days of receipt. ...... 5

Despite the Corps delaying the process using "exceptions," on July 30, 2021, David Hobbie, Chief, Regional Regulatory Division, told three separate interested parties that public comment was not needed because the Corps had all of the information that it needed for the "decision making process." .............................................................. 6

Lafayette is the most convenient forum to litigate these claims because several project owners/ investors live in Lafayette, Louisiana, several others live in Texas, and even the Corps of Engineers attorneys are closer to Lafayette, Louisiana than Alaska. .......... 7

The Corps of Engineers grants 99% of permits submitted to the Alaska District while evaluating most applications within 60 – 120 days of submission and, for political reasons, has deviated from the norm and is not willing to take permit action on IPOP's permit application. ................................................................................................. 9

The Corps of Engineers has delayed issuing a permit decision due to the influence of the Alaska Native Corporations that control mining operations in Alaska. ................. 10

The Alaska Native Corporations who are opposing IPOP's permit are IPOP's mining competitors, not concerned environmentalists. ............................................................ 12

The Alaska Native Corporations funded the STOP IPOP public relations campaign and control the press and have used this megaphone to spread misinformation regarding IPOP's permit application and their desire to mine for gold. ..................................... 16

IPOP's mining proposal is simple and does not impact the environment in any way, leaving special interest group influence as the only reason for the Corps of Engineers refusal to approve the permit. ........................................................................................ 18

It is in the interest of justice that this matter remains in Lafayette, Louisiana. ............ 19

The Corps of Engineers must show "good cause" for the requested venue transfer using both public and private factors while showing that its suggested venue is more convenient than the venue selected by IPOP. ............................................................... 21

The private factors all favor venue in Louisiana as this action is based upon the Administrative Procedures Act, will not require any witness testimony, and the evidence will be limited to the Corps of Engineers' Administrative record. ................ 21

The public factors all favor venue in Louisiana as IPOP is unable to obtain a fair trial in Alaska due to the power and opposition of the Alaska Native Corporations that control the minerals, real estate, economy, culture, news outlets, and political system in Alaska. ..................................................................................................................... 23

Conclusion ................................................................................................................ 27

## Table of Authorities

Cases

*City of New York v. Gen. Motors Corp.*, 357 F. Supp. 327 (S.D.N.Y. 1973). ................. 19

*Gulf Oil Corp. V. Gilbert*, 330 U.S. 501 (1947) ........................................... 20, 22

*Haase v. Gilboy*, 246 F. Supp. 594 (E.D. Wis. 1965) ...................................... 19

*In re Volkswagen AG*, 371 F.3d 201 (5th Cir. 2004) ..................................... 20

*In re Volkswagen of America, Inc.*, 545 F.3d 304, 315 (5th Cir. 2008).................... 18

*Norton v. Encompass Servs. Corp.*, 301 B.R. 836 (S.D. Tex. 2003). ....................... 19

*Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 102 S. Ct. 252, 241 n.9, 70 L. Ed. 2d 419 (1981). ..................................................................................... 20

*Reiffin v. Microsoft Corp.*, 104 F. Supp. 2d 48, 50 (D.D.C. 2000)...................... 4

*Spound v. Action Indus.*; 369 F. Supp. 1066, 10689 (SD IL 1974). ....................... 4

*Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 30, 108 S. Ct. 2239, 101 L. Ed. 2d 22 (1988). ................................................................................. 4, 22

*Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964). ..................................... 4

Statutes

28 U.S.C. § 1404. ..................................................................... 4, 19

33 C.F.R. § 325.4. ..................................................................... 6

Other Authorities

M. Sullivan, "Alaska Native corporations:  'Homegrown engines of the economy,'" *Indian Country Today* (available at https://indiancountrytoday.com/news/alaska-native-corporations-homegrown-engines-of-the-economy). ...................................... 11

## Argument

**The interests of justice mandate that this matter remain in the Western District of Louisiana as IPOP is unable to obtain a fair trial in Alaska due to discrimination based upon the economic, cultural, and political pressure from Alaskan special interest groups that consist of competing miners posing as environmental activists while they mine resources from adjacent lands.**

A motion for change of venue is subject to 28 U.S.C. § 1404(a), which states: "[f]or the convenience of parties and witnesses, ***in the interest of justice,*** a district court may transfer any civil action to any other district or division where it might have been brought."[1] Furthermore, "[t]he purpose of section 1404 is to prevent waste of time, energy, and money, and to protect litigants, witnesses, and the public against unnecessary inconvenience and expense."[2] Section 1404(a) "vests 'discretion in the district court to adjudicate motions for transfer according to an "individualized, case-by-case consideration of convenience and fairness."'"[3] The district court also must balance the convenience of the witnesses and those public-interest factors of systemic integrity and fairness that, in addition to private concerns, come under the heading of 'the interest of justice.'"[4]

A plaintiff should not be sent to a forum that does not assure it a fair trial.[5] In this case, the facts and procedural posture of this claim clearly show that the plaintiffs are unable to obtain a fair evaluation of their permit application in Alaska.  As such, the

---

[1] 28 U.S.C. § 1404. (Emphasis Added)

[2] *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964).

[3] *Reiffin v. Microsoft Corp.*, 104 F. Supp. 2d 48, 50 (D.D.C. 2000) (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29, 108 S. Ct. 2239, 101 L. Ed. 2d 22 (1988) (quoting *Van Dusen*, 376 U.S. at 622)).

[4] *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 30, 108 S. Ct. 2239, 101 L. Ed. 2d 22 (1988).

[5] *Spound v. Action Indus.*; 369 F. Supp. 1066, 10689 (SD IL 1974).

plaintiffs, that include several residents of Lafayette, Louisiana, urge this Honorable Court to allow this matter to proceed in the Western District of Louisiana in the interests of fairness and justice as the economic, cultural, and political pressure from Alaskan special interest groups, that consist of competing miners, makes a fair trial in Alaska impossible.

**The Corps is required to process a permit application within sixty days of receipt.**

IPOP submitted its application for a permit to the Corps of Engineers on March 16, 2018, over four years ago. The detailed chronology of the permit application and the Corps of Engineers' delayed response is chronicled in the Complaint, Paragraphs 39 – 208 and are referenced herein as if copied in extenso.[6] Local discrimination against IPOP, an out-of-state entity, is the only explanation for this delay as the Corps of Engineers' rules mandate a timely decision.

The Corps of Engineers' rules and regulations mandate that a permit application should be processed on a reasonable timeline. A sixty-day timeline is authorized by C.F.R. § 325.4(d)(3) that declares that "District engineers will decide on all applications not later than 60 days after receipt of a complete application, …" Pursuant to 33 C.F.R. § 325.4(a)(3), "The district engineer should not delay processing of the application unless the applicant requests a reasonable delay, normally not to exceed 30 days, to provide additional information or comments."[7] IPOP has never requested such a delay.

The Corps has arbitrarily delayed this matter by fabricating several exceptions to the sixty day deadline including the other "procedures required by law" to invoke a subsection (i) exception to the sixty-day rule; repeatedly extended comment periods to

---

[6] Rec. Doc 1, Paragraphs 39 – 208.

invoke a subsection (ii) exception to the sixty-day rule; and claimed that additional information has not been timely supplied by the applicant to invoke a subsection (iv) exception to the sixty-day rule.

These "exceptions" are not legitimate requests for delay and are nothing more than the Corps of Engineers' attempt to delay the evaluation of a permit using any means possible. Again, this delay is based upon ongoing pressure from local special interest groups, competing miners, that are posing as environmental activists.

**Despite the Corps delaying the process using "exceptions," on July 30, 2021, David Hobbie, Chief, Regional Regulatory Division, told three separate interested parties that public comment was not needed because the Corps had all of the information that it needed for the "decision making process."**

Despite the Corps of Engineers' local representatives continuing to use additional comment periods, studies and requests for additional information to delay the issuance of IPOP's permit, the Corps of Engineers' Chief, Regional Regulatory Division, David S. Hobbie who is stationed in Fairbanks, Alaska, denied three separate requests for public hearings on July 30, 2021. (Mr. Hobbie's correspondence is attached as Exhibit #1, Exhibit #2, and Exhibit #3)  In all three denials, Mr. Hobbie declined the request for a public hearing by stating that the Corps of Engineers had all the information needed to complete its decision making process.  All three letters stated as follows:

> The concerns raised by you and others have been brought to my attention and have been included in the public record of this case. As stated in our regulations (33 CFR 327), a public hearing is to be held "for the purpose of acquiring information or evidence ... " to aid in the evaluation of a Department of the Army permit application. The record contains adequate information regarding your concerns and a hearing would not provide new information to include in the decision-making process for this permit application. For

---

[7] 33 C.F.R. § 325.4.

these reasons a public hearing will not be held.[8]

Mr. Hobbie stated that the Corps of Engineers had already had three public comment periods that provided the public with an adequate opportunity to present information.[9]  Mr. Hobbie stated that the "local public," "the people of Nome," and the "projects potential impact on the socio-cultural, economic, and ecological systems of the region" had been adequately vetted. [10]

Despite the Corps of Engineers indicating the provision of additional information was not needed as of July 2021, thirteen months later the local office has yet to issue IPOP a permit.

**Lafayette is the most convenient forum to litigate these claims because several project owners/ investors live in Lafayette, Louisiana, several others live in Texas, and even the Corps of Engineers attorneys are closer to Lafayette, Louisiana than Alaska.**

Plaintiffs Edward C. Abell and Elaine Abell were early investors in IPOP's gold mining enterprise and are residents of Lafayette, Louisiana. Mr. and Mrs. Abell, when advised that a permit to operate the mining project had NOT been obtained, asked how it was possible to have obtained a lease of the subject property from the Corps of Engineers, and then not be awarded a permit to mine it. This made no sense,  particularly in view of the fact that IPOP is required to pay a rental of some $18,000.00 per year for the lease, and 99% of similar leases obtain permits timely.

IPOP was formed to develop gold deposits in the Bonanza Channel east of Nome, Alaska.  Through core sampling and examination by gold mining experts, the plaintiffs

---

[8] Exhibit 1 -3.

[9] Exhibit #1-2.

[10] Exhibit 1 -3.

have confirmed that these deposits are worth billions of dollars. Through a contract entered into in 2014, the Abells invested in the mining operations and are entitled to a fixed proportions of all revenues received by the mining operations.  However, due to the Corps of Engineers unreasonable permitting delays, the Abells have not seen any return on their investment.

In addition to these Lafayette, Louisiana based investors, many other investors live in Texas, within close proximity to the Western District of Louisiana.  Most importantly, not a single partner, investor, or corporate representative involved with the mining operation lives within the State of Alaska. As such, the $17,000,000 that IPOP has already invested in this project has all come from outside of Alaska. These investors deserve legal protection in the form of an unbiased jurisdiction to evaluate their permit application. Unfortunately, such an unbiased jurisdiction will not be afforded to them in Alaska due to the power of local interest groups that compete with IPOP as miners of local gold deposits.

The Western District of Louisiana is a far more convenient forum for the Louisiana based investors in the mining operation to protect their interests than a forum that is 3,860 miles away from Lafayette, Louisiana.  Most of the investors are elderly, and it is not easy for them to travel to a remote location such as Alaska, seriously interfering with their right to oversee the litigation.  On the other hand, the Corps of Engineers already has a presence and a lawyer located in Lafayette, Louisiana and is not inconvenienced in any way by litigating in this forum. Additionally, both the defendants, and their Department of Justice supplied attorneys, are based in Washington, D.C., approximately 2,600 miles closer to Louisiana than to Alaska, making their travel much

easier as well.

**The Corps of Engineers grants 99% of permits submitted to the Alaska District while evaluating most applications within 60 – 120 days of submission and, for political reasons, has deviated from the norm and is not willing to take permit action on IPOP's permit application.**

The Alaska District of the Corps of Engineers has jurisdiction over the area where IPOP is seeking permission to mine/ dredge.  The Alaska District's Program Overview of 2017 provides a snapshot as to the District's propensity for issuing permits.  (A copy of the Alaska District Regulatory Program – Program Overview 2017 is attached as Exhibit #4) The Program Overview indicates that the Alaska District averaged 45 – 60 days for permit processing on Section 404 permits, permits similar to the permit requested by IPOP.  In special circumstances that involve public comment or a potentially significant impact, the average permit approval time extends to 120 days. In addition to touting how quickly the District grants permits, the Program Overview also touts its record of issuing over 99% of the permits requested.  In fact, the District states that during the five-year period running from 2011 – 2016, the District issued 902 permits and only denied 2 permits.  As such, less than 1% of the permits applied for were denied by the Alaska District. Based upon the statistics, the Alaska District is efficient, and grants permits freely and quickly to almost every entity that applies.

Despite touting its speedy processing of permits and its high issuance rate, four years later IPOP is still without a permit determination.  As shown below, this egregious departure from the normal operation of the Alaska District is due to the influence, pressure, and opposition of the Alaska Native Corporations, a direct mining competitor of IPOP's.

**The Corps of Engineers has delayed issuing a permit decision due to the influence of the Alaska Native Corporations that control mining operations in Alaska.**

As explained above, the Corps of Engineers is responsible for reviewing an application within sixty days of receipt, and IPOP submitted its permit application over four years ago.  The reasons for the Corps of Engineers' delay are the same reasons that motivated the plaintiffs to file suit in Louisiana, the local mining companies owned by the Alaskan Native Corporations control the press, cultural, economic, regulatory, and political process in Alaska and are fixated on putting IPOP out of business as they are a non-Alaskan owned mining operation that directly competes with them.  The details regarding the economic, regulatory, and political hurdles that IPOP has encountered in Alaska are detailed in the attached Declaration of Edwin A. Epstein, Jr., the founder of IPOP and the General Partner of Rivers of Gold. (A copy of the Declaration is attached as Exhibit #5)

As explained by Mr. Epstein, Alaska is controlled by the power and influence of a series of regional, for-profit corporations established under the Alaska Native Claims Settlement Act (and their affiliated non-profit entities).[11]  These corporations are collectively referred to as the "Alaska Native Corporations."  Congress donated the property rights to 39.8 million acres of Alaska lands to these Alaska Native Corporations, who have evolved into extraordinarily wealthy and politically powerful enterprises. In 2018, the Alaska Native Corporations reported more than $10.5 billion in total revenues and accounted for almost 50% of the rankings in the *Alaska Business*' listing of the top 49 corporations in the State and "they continuously take the top ten spots in the State's

---

[11] Exhibit #5.

corporate rankings."[12]

The huge Alaskan real estate holdings granted to these Alaska Native Corporations have allowed the corporations to become some of the largest and most powerful mining enterprises in the world.[13] These entities use this clout to pursue its mining interests and punish non-Alaska based competitors. For example, one of the Alaska Native Corporations, NANA Corporation, who earned over $700 million in profits over the last three years, has an operating agreement for the Red Dog Mine, an enormous open pit mine that is the largest lead-zinc producing site in the world.[14] It is also, according to the U.S. Environmental Protection Agency, the source of more toxic releases into the environment than any other facility.[15] Despite being a polluter, the Alaska Native Corporation controlled Red Dog Mine continues to receive Corps of Engineers permits without the difficulties experienced by IPOP.

Below are aerial photographs of the port facilities for the Red Dog Mine and the actual Red Dog Mine. As the Red Dog Mine, and its related infrastructure, are owned by entities affiliated with the Alaska Native Corporations, the Corps of Engineers has quickly permitted Red Dog's enormous permanent alterations of terrain with a massive environmental footprint without any delays caused by recurring environmental studies or the provision of additional information.

---

[12] M. Sullivan, "Alaska Native corporations: 'Homegrown engines of the economy,'" *Indian Country Today* (available at https://indiancountrytoday.com/news/alaska-native-corporations-homegrown-engines-of-the-economy).

[13] Exhibit #5.

[14] Exhibit #5, Paragraph 15.

[15] Exhibit #5, Paragraph 15.

**Red Dog Mine Port Facility**

**Red Dog Mine**





On the other hand, IPOP's temporary dredging activities leave no permanent structures or damage to the environment. Where Red Dog has had its way with the environment, despite being designated as a polluter, IPOP has been waiting over four years for its permit from the Corps of Engineers despite utilizing a process that does not cause any environmental damage.

**The Alaska Native Corporations who are opposing IPOP's permit are IPOP's mining competitors, not concerned environmentalists.**

In addition to being politically, socially, and economically powerful, these Alaska Native Corporations are also direct mining competitors of IPOP.[16]  For example, the federal government granted the Bering Straits Native Corporation (BSNC) over two million acres of mineral rights (including gold) on the Seward Peninsula, the southern coast of which is where IPOP has staked its mineral claims.[17]  BSNC owns 69,000 acres of historically proven mineral rights (including gold) adjacent to and surrounding IPOP's

---

[16] Exhibit #5.

[17] Exhibit #5, Paragraph 24.

claims.[18]   BSNC reported more than $468 million in operating revenues in 2021.[19] Despite actively mining the area, BSNC is the leading opponent of IPOP's permit citing environmental concerns.

BSNC enjoys a great deal of power and influence in and around Nome, Alaska with their power extending well beyond mining.[20]   In fact, the reach of BSNC included using its influence to keep IPOP from having the ability to rent any office space in Nome, Alaska as most of the real estate is owned by Alaska Native Corporations.[21]   A subsequent review of the public records determined that BSNC owns eighty-five Nome properties, including many industrial properties.[22] If the Native Corporations can keep a company from renting office space, when it is vacant and available, exerting political pressure to keep a competitor from receiving a permit is a consistent strategy.

BSNC is a direct competitor of IPOP and has led the charge for lobbying the Corps of Engineers to not provide IPOP with a permit. BSNC is upset because they want to obtain control of the lands that their predecessors previously controlled.[23] The precise area where IPOP has made its gold discovery had been claimed prior to 1979 by the local Native Alaskan interests that now form BSNC, the Solomon Native Corporation, and the Village of Solomon.[24]   However, the IPOP claims area was relinquished to the State of Alaska as part of a 1979 Settlement Agreement between BSNC, the State of Alaska, the

---

[18] Exhibit #5, Paragraph 24.

[19] Exhibit #5, Paragraph 24.

[20] Exhibit #5, Paragraph 27.

[21] Exhibit #5, Paragraph 26.

[22] Exhibit #5, Paragraph 26.

[23] Exhibit #5, Paragraph 17.

[24] Exhibit #5, Paragraph 27.

Village of Solomon and the Bureau of Indian Affairs.[25]  This very area, with its mining rights acquired in 2017 by IPOP under Alaska law, is one of the few areas along the coast of the Seward Peninsula not under the control of BSNC or other Native Alaskan Corporations.[26]  Clearly, BSNC would like to obtain the rights to IPOP's mining claims as IPOP has confirmed the presence of billions of dollars of gold.

Opposition to IPOP's project is primarily driven by four Native Alaskan corporations:  Bering Straits Native Corporation (BSNC), Solomon Native Corporation, Norton Sound Economic Development Corporation (NSEDC), and a non-profit corporation, Kawerak, Inc. (described as the non-profit arm of BSNC), in association with the Village of Solomon.[27]  When defendants assert that "the local tribal communities have been following IPOP's permit application carefully and reporting on it in their own newsletters," it is referring primarily to these large, powerful entities. Their combined annual income in 2022 will likely exceed $500 million.[28]

The Alaska Native Corporations are trying to thwart IPOP's efforts to obtain a permit with a plan to take over their mining operation. As permitting delays dragged on, IPOP representatives began to hear from sources in Nome that IPOP's opponents hoped to exhaust IPOP's resources and cause IPOP to abandon its equipment in Nome, or sell it at salvage prices, so it could be used by local entities who do not experience the same permitting problems as IPOP.[29]  Based upon the influence that the Alaska Native

---

[25] Exhibit #5, Paragraph 27.

[26] Exhibit #5, Paragraph 27.

[27] Exhibit #5.

[28] Exhibit #5, Paragraph 17.

[29] Exhibit #5, Paragraph 37.

Corporations are exerting over the Corps of Engineers, these rumors appear to be true.

IPOP's investigation determined that BSNC has pursued a similar strategy before and took over the Rock Creek Gold Mine after the mine ran into extensive regulatory difficulties with the Alaska District of the Corps of Engineers.[30]  After the mine went out of business due to these regulatory issues, BSNC then acquired the operation and sold off the Rock Creek equipment for $16.5 million, a substantial profit from its distressed price acquisition.[31]

One of the other opponents, the Solomon Native Corporation, also consists of landowners with competing contiguous gold mineral interests adjacent to IPOP.[32] Some members of the Solomon Native Corporation have been involved in direct harassment of IPOP operations and have made demands for economic benefits from the project.[33] Showing that these Alaska Native Corporations are purely economic entities, the City of Solomon, the nominal beneficiary of the Corporation has a census population of zero.[34] So, a group representing a population of zero is attempting to thwart IPOP's efforts to protect its non-existent population.  The true purpose of the Corporation is to protect its economic control over mining conducted in Alaska, even when such competitors obtained the rights to mine lawfully. Again, this harassment is based upon wanting to take IPOP's economic opportunity, not a preservation of the environment.

---

[30] Exhibit #5, Paragraph 37.

[31] Exhibit #5, Paragraph 37.

[32] Exhibit #5, Paragraph 38.

[33] Exhibit #5, Paragraph 38.

[34] Exhibit #5, Paragraph 28.

**The Alaska Native Corporations funded the STOP IPOP public relations campaign and control the press and have used this megaphone to spread misinformation regarding IPOP's permit application and their desire to mine for gold.**

Th Alaska Native Corporations have been conspiring with Leslie Tose, a Project Manager at the Corps of Engineers, to create a public relations campaign, "STOP IPOP," and to feed misinformation to the press that they control.[35] The Alaska Native Corporations embarked upon a public relations campaign working with Corps representatives to try to STOP IPOP. (A set of the "public information" flyers is attached as Exhibit #6) The documents included in Exhibit #6 include numerous quotes from Ms. Tose encouraging, and directing, local citizens to provide the information needed to "STOP IPOP."[36]

In addition to the Corps of Engineers assisting to help with generating opposition to the project, the Alaska Native Corporations, including BSNC, incentivized residents to provide photographs, videos, and comments by offering to provide them with "prizes" for submitting this information.[37] As such, the public outrage mentioned by project opponents is really a group of local residents hoping for the provision of prizes if they provide the Alaska Native Corporations with help in shutting down IPOP.  A sample of the Alaska native Corporation's requests is included below[38]:

---

[35] Exhibit #5, Paragraph 42 & Exhibit #6.

[36] Exhibit #6.

[37] Exhibit #6.

[38] Exhibit #6.



In addition to the public relations campaign, since IPOP submitted its permit application, 27 articles have been published in the KNOM and Nome Nugget that disparage the IPOP proposal and encourage citizens to oppose the project. (A set of articles published in the local press is attached as Exhibit #7)  This continual stream of misinformation, that has been placed in the public domain by the Alaska Native Corporations, has "poisoned the well" and made it impossible for IPOP to obtain a fair evaluation of its permit application.   Unfortunately, this public relations campaign was supported by a steady stream of misinformation supplied by Leslie Tose, a Corps of Engineers employee, who should have maintained neutrality as an officer tasked with the evaluation of the permit.[39]   Instead, Ms. Tose did nothing more than coordinate with the Alaska Native Corporations and devise methods of delaying the permit and turning the

public against IPOP and their proposed project.[40]

This misinformation campaign was orchestrated by the Alaska Native Corporations, mining competitors of IPOP, with the goal of forcing IPOP to abandon its mining claim and equipment.

**IPOP's mining proposal is simple and does not impact the environment in any way, leaving special interest group influence as the only reason for the Corps of Engineers refusal to approve the permit.**

Despite the environmental misinformation spread by these Alaska Native Corporations, IPOP simply uses a suction dredge to excavate material from the channel, extracts the gold through a gravity driven process using no chemicals, and then re-deposits the material on the seafloor.[41]   The wind, waves, and ice effects in this region will quickly remove visible traces of the dredging operations leaving behind no environmental damage.   Furthermore, IPOP undertook to curtail its operations with an underwater silt curtain to address claims that the dredging would cause temporary increases in water turbidity.

Despite these concessions, and an environmentally sound plan, IPOP has been held up for years with the Corps of Engineers due to new and escalating demands as detailed in the Complaint.   No such demands have been made (or any silt curtain required) for any other comparable Alaska dredge projects, including many projects operated by the Corps of Engineers itself, or Alaska Native Corporation mining interests, even where those projects are far larger in dredging volume scope and acreage size.

The only explanation for these ever changing regulatory requirements, and the

---

[39] Exhibit #5, Paragraph 42 & Exhibit #6.

[40] Exhibit #5, Paragraph 42.

[41] Exhibit #5, Paragraph 37.

refusal to issue a permit for four years, is the political, social, and economic power of the Alaska Native Corporations who directly compete as miners with IPOP and own the mining rights to the lands adjacent to the lands controlled by IPOP.  These pressures form the basis for IPOP's venue selection and show why IPOP cannot receive a fair trial in Alaska.

**It is in the interest of justice that this matter remains in Lafayette, Louisiana.**

The burden of proof in a motion for transfer of venue is placed upon the moving party to "clearly demonstrate" that the listed requirements are met.[42] The Corps of Engineers has not carried this burden. The Fifth Circuit has held that two issues must be considered when considering motions to transfer venue.[43] The Court must first determine whether the suit could have been brought in the proposed new venue. The Court must then look to section 1404(a) to determine whether transfer serves the convenience of parties and witnesses and is in the interest of justice.[44] The parties concede that this suit could have been brought in either Louisiana, as several plaintiffs live here, or in Alaska where the proposed project is located. As such, the interests of justice and convenience of the parties is the only issue in dispute.

The transfer of venue is governed by 28 U.S.C. § 1404 that states:

> **§ 1404. Change of venue**
> (a) For the convenience of parties and witnesses, *__in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought__* or to any district or division to which all parties have consented.
> (b) Upon motion, consent or stipulation of all parties, any

---

[42] *In re Volkswagen of America, Inc.*, 545 F.3d 304, 315 (5th Cir. 2008).

[43] *Id.*

[44] *Id.*

action, suit or proceeding of a civil nature or any motion or hearing thereof, may be transferred, in the discretion of the court, from the division in which pending to any other division in the same district. Transfer of proceedings in rem brought by or on behalf of the United States may be transferred under this section without the consent of the United States where all other parties request transfer.

(c) A district court may order any civil action to be tried at any place within the division in which it is pending.

(d) Transfers from a district court of the United States to the District Court of Guam, the District Court for the Northern Mariana Islands, or the District Court of the Virgin Islands shall not be permitted under this section. As otherwise used in this section, the term "district court" includes the District Court of Guam, the District Court for the Northern Mariana Islands, and the District Court of the Virgin Islands, and the term "district" includes the territorial jurisdiction of each such court.[45]

Courts should also consider whether the parties would be able to receive a fair trial in each of the possible venues.[46] External factors such as adverse pretrial publicity (as we have here) can deprive a litigant of a fair trial and is a factor that a court may consider in determining the propriety of transfer pursuant to § 1404.[47] In this case, the plaintiffs are unable to obtain a fair trial in Alaska as the political landscape for mining in this section of Alaska is dominated by Alaska Native Corporations who control the mining rights to the lands adjacent to IPOP's proposed mining area and is marshaling its members to oppose the permitting of the IPOP project. This special interest opposition to IPOP's permit, while they are mining on adjacent lands, forms the underlying cause of the delay of the permit evaluation and provides the sole reason that this matter belongs in Louisiana.

---

[45] 28 U.S.C. § 1404. (Emphasis Added)

[46] *Norton v. Encompass Servs. Corp.*, 301 B.R. 836 (S.D. Tex. 2003).

[47] *Haase v. Gilboy*, 246 F. Supp. 594 (E.D. Wis. 1965); *City of New York v. Gen. Motors Corp.*, 357 F. Supp. 327 (S.D.N.Y. 1973).

**The Corps of Engineers must show "good cause" for the requested venue transfer using both public and private factors while showing that its suggested venue is more convenient than the venue selected by IPOP.**

The determination of a motion to transfer venue requires the court to consider both private and public interest factors, none of which on their own hold dispositive weight.[48] While these interest factors do not include a plaintiff's choice of venue, it must still be taken into account and creates a "significant burden on the movant to show good cause for the transfer."[49] Therefore, the analysis of these private and public interest factors must incorporate the importance of plaintiffs' choice of venue. When the transferee venue is not clearly more convenient than the venue chosen by the plaintiff, the plaintiff's choice should be respected.[50]

**The private factors all favor venue in Louisiana as this action is based upon the Administrative Procedures Act, will not require any witness testimony, and the evidence will be limited to the Corps of Engineers' Administrative record.**

The Court must look to several private factors when evaluating potential venues. The private factors include: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive.[51]  As this is an Administrative Procedures Act case that will be decided upon the Administrative Record via motion practice, with no witness testimony, the private factors are either neutral towards both the District Courts

---

[48] *Id.*

[49] *Id.*

[50] *Id.*

[51] *Gulf Oil Corp. V. Gilbert*, 330 U.S. 501 (1947); *In re Volkswagen AG*, 371 F.3d 201 (5th Cir. 2004).; *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 102 S. Ct. 252, 241 n.9, 70 L. Ed. 2d 419 (1981).

of Louisiana and Alaska or lean towards keeping Louisiana as a venue. All four private factors are analyzed below.

**(1) the relative ease of access to sources of proof**

As referenced by the Corps of Engineers, this is a case filed pursuant to the Administrative Procedures Act. As such, the Administrative Record will provide the complete set of evidence and the matter will be decided upon the filing of dispositive motions that will be based upon the Administrative Record. As the Administrative Record will be compiled by the Corps of Engineers and exchanged between the parties electronically, the access to sources of proof does not change between the two potential venues.

**(2) the availability of compulsory process to secure the attendance of witnesses**

As this is an Administrative Procedures Act proceeding that will be presented upon the Administrative Record and evaluated via motion practice, the attendance of witnesses will not be required. As such, this matter will not include any fact witness depositions or trial appearances, making the location of witnesses irrelevant. As such, witness availability does not sway the analysis towards either Louisiana or Alaska.

**(3) the cost of attendance for willing witnesses**

As stated above, this case is based upon the Administrative Procedures Act and will not involve the calling of any witnesses. As such, witness availability does not sway the analysis towards either Louisiana or Alaska.

**(4) all other practical problems that make trial of a case easy, expeditious and inexpensive**

As this case will be decided upon the Administrative Record via motion practice,

maintaining the matter in Louisiana provides the easiest and least expensive venue to litigate these issues.  In this matter, several of the plaintiffs live in Louisiana, counsel for the plaintiffs lives in Louisiana, and transferring the matter to Alaska will significantly increase the costs associated with the plaintiffs and counsel attending court conferences. On the other hand, counsel for the Corps of Engineers is based in both Washington, DC and Lafayette, Louisiana and travel to Louisiana, if required, is significantly cheaper and easier than travel to Alaska.  As this case is postured, DC based counsel for the Corps of Engineers will have to travel regardless of the venue, and Louisiana is certainly a more efficient and less expensive choice.

Overall, the private factors to be considered are either neutral towards the District Courts of Louisiana and Alaska or lean towards keeping Louisiana as a venue. As such, the plaintiffs' choice of venue should be maintained as the Corps of Engineers has not carried its burden to show that a transfer is required pursuant to any of the private interest factors.

**The public factors all favor venue in Louisiana as IPOP is unable to obtain a fair trial in Alaska due to the power and opposition of the Alaska Native Corporations that control the minerals, real estate, economy, culture, news outlets, and political system in Alaska.**

The public interest factors are: (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws of the application of foreign law.[52] The district court also must consider public-interest factors of systemic integrity and fairness

---

[52] *Gulf Oil Corp. V. Gilbert*, 330 U.S. 501 (1947).

that, in addition to private concerns, come under the heading of 'the interest of justice.'"[53]

**(1) the administrative difficulties flowing from court congestion**

The plaintiffs understand that the Western District of Louisiana may be a bit busier than the District Courts in Alaska.  However, based upon twenty-four years of experience practicing in the Western District of Louisiana, the case load of the District Court has never been a problem with the adjudication of cases.  In fact, the docket controls administered by the Court provide for an efficient, and timely, adjudication of disputes in the Western District of Louisiana.

Although the docket load in Alaska may be a bit lower, the Western District of Louisiana does not have any "administrative difficulties" that flow from court congestion. As such, the potential administrative difficulties factor does not sway the analysis towards either Louisiana or Alaska, as neither District has administrative difficulties.

**(2) the local interest in having localized interests decided at home**

The plaintiffs concede that this Complaint involves a request for a permit to mine for gold in the State of Alaska. So, Alaska has a local interest in the outcome of this matter.

However, there is also a significant local interest in Louisiana. Several of the plaintiffs, who are owners of the rights to mine in Alaska, live within the Western District of Louisiana.  As such, the citizens of Lafayette, Louisiana have a localized interest in ensuring that they are treated fairly when doing business in other States, a local interest that should be decided here at home. As we have shown in this Memorandum, the citizens of Louisiana, who have applied for a permit to mine from the Corps of

---

[53] *Stewart Org.*, 487 U.S. at 30.

Engineers, cannot be treated fairly in the State of Alaska and this Honorable Court has an obligation to allow these injured plaintiffs to adjudicate their dispute with the Corps of Engineers in a fair venue where their claims can be properly adjudicated.  As such, the Western District of Louisiana is the proper venue for adjudicating these claims, which are of local interest to the residents of Louisiana who have invested in this project.

As such, the public interest factor regarding the protection of local interests could sway between either Alaska, for its interest in mining, or Louisiana, for its interests in protecting the investment of its citizenry. With these competing interests, the plaintiffs' choice of forum should prevail.

**(3) the familiarity of the forum with the law that will govern the case**

This case is governed by 5 U.S.C. § 706, the Administrative Procedure Act that provides the District Court with the authority to compel an agency to take action when it has been unreasonably withheld.   5 U.S.C. § 555(b) establishes a general statutory requirement that "[w]ith due regard for the convenience and necessity of the parties or their representatives and within a reasonable time, each agency shall proceed to conclude a matter presented to it."

This mater, as it is currently postured, simply asks the District Court to compel the Corps of Engineers to issue a permit determination regarding IPOP's permit application.  This determination does not require any special knowledge of gold mining or any specific knowledge of Alaska.  As such, this Honorable Court is familiar with the Administrative Procedures Act and the Corps of Engineers' requirement to make permit decisions on a timely basis, the only issues relevant to this matter.

As such, the public interest factor related to each forum's familiarity with the law

is a draw between the parties as both potential venues are familiar with the Administrative Procedures Act and a Federal agency's requirement to issue a permit decision timely.

**(4) the avoidance of unnecessary problems of conflict of laws of the application of foreign law**

The public interest factor related to the interpretation of foreign law is not applicable to this matter.  As such, this factor does not favor either jurisdiction.

**(5) systemic integrity and fairness/ the interest of justice**

The public interest factor related to systemic integrity, fairness, and the interests in justice fall strongly in favor of maintaining venue in the Western District of Louisiana and form the motivation for filing this lawsuit in Louisiana.

As explained in detail above, IPOP submitted its permit application over four years ago.  The Corps of Engineers has delayed the issuance of this permit due to the opposition generated by the local mining companies that are owned by the Alaska Native Corporations that control the economic, regulatory, and political process in Alaska and are set on putting IPOP out of business as they are a non-Alaskan owned mining operation that directly competes with them.

The local power of the Alaska Native Corporations, where they control the minerals, real estate, economy, culture, news outlets, and political system, make it impossible for IPOP to obtain a fair trial of its alleged grievances.  Based upon the residence of the plaintiffs and the lack of Alaska Native Corporation investors, IPOP will be unable to obtain a fair and unbiased evaluation of its permit application in Alaska as the local political and economic powers are dedicated to putting IPOP out of business and

obtaining their mining equipment/ rights, in an effort to mine the gold that IPOP had discovered.

**Conclusion**

IPOP seeks to preserve venue in Louisiana in the interest of justice to avoid local permit discrimination as the cultural, social, political, and economic forces in Alaska, that are dominated by IPOP's Alaska based mining competitors who oppose the granting of the referenced permit, create a situation where IPOP is unable to obtain a fair hearing of the issues alleged in the Complaint if the case is transferred to Alaska.

Respectfully submitted,

**MILLER, SULLIVAN & DEMARCAY, LLC**

_____
**LAWRENCE R. DeMARCAY, III (#25379)**
1100 Poydras Street, Suite 1515
New Orleans, Louisiana 70163
P.504-708-1300
lrd@msdnola.com

and

**Chris M. Trepagnier (#25528)**
**THE TREPAGNIER LAW FIRM, APLC**
215 West Beach Parkway
Mandeville, Louisiana 70448
P. 985-778-0888
chris@treplawfirm.com

Attorneys for Plaintiffs

## **CERTIFICATE OF SERVICE**

By filing electronically, I certify that service was accomplished through the Notice of Electronic Filing for parties and counsel who are Filing Users and that service was accomplished on any party or counsel who is not a Filing User in accordance with the Federal Rules and the Local Rules of this Court.

_____

**LAWRENCE R. DeMARCAY III (#25379)**